# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE



IN RE:
DONNY G. CARTEE
    Debtor.

                         Case No. 07-01526
                         Chapter 11
                         Judge George C. Paine, II

DONNY G. CARTEE,
    Plaintiff

v.
                         Adversary No.: 07-0085A

REBECCA A. CARTEE, et al.
    Defendant

## MEMORANDUM

    This adversary proceeding is before the court to resolve a family dispute revolving around operation and ownership of a family farm. Donny G. Cartee (hereinafter "Don" or "debtor") removed his lawsuit from the Chancery Court of Williamson County *(Don G. Cartee, Plaintiff vs. Rebecca A. Cartee, F.B. Murphy, Trustee, and Mark L. Puryear III, Trustee, Defendants)* to the bankruptcy court after filing his chapter 11 petition on March 2, 2007. The defendant, Rebecca A. Cartee (hereinafter "Rebecca") is the mother of the debtor. The pretrial order in this adversary proceeding combined the issues from the removed action with claims litigation regarding Rebecca, Alan Cartee (hereinafter "Alan"), brother of the debtor, and Diana Day Cartee (wife of Alan). The court is asked to parse through the intensely acrimonious family fighting to, in essence, "divvy up" the family assets and determine which family member owes what amount

to another family member.  The following constitutes the court's findings of fact and conclusions of law. FED R.BANKR. PROC. 7052.

## FACTUAL BACKGROUND

> They say that blood is thicker than water. Maybe that's why we battle our own with more energy and gusto than we would ever expend on strangers.

David Assael, <u>Northern Exposure</u>, *Family Feud*, 1993. Never were truer words spoken than these about this family dispute.  The court's difficulty in setting forth any sort of factual background in this adversary proceeding is that nearly every fact in this entire case is disputed.  The parties managed to stipulate to the following prior to trial:

A.  Don Cartee filed a Chapter 11 bankruptcy petition on March 2, 2007.

B.  Don Cartee was married to Marie Cartee on May 17, 2003.

C.  Rebecca Cartee is a widow, her husband Melvyn Cartee having died on October 14, 1999.

D.  Rebecca Cartee has three sons, Alan Cartee, Brent Cartee, and Don Cartee.

E.  Don Cartee and Rebecca Cartee each own a one-half tenancy in common interest in the 100 acres of real property located at 1528 Old Hillsboro Road, Franklin, Tennessee (the "100 Acre Parcel").   This was also stipulated by the parties and was entered as part of a pre-trial order of the Court dated November 8, 2007.

F.  Don and Rebecca Cartee are each obligated on two loans serviced and/or underwritten by Grassland Financial Services secured by the 100 Acre Parcel.

G.  Don Cartee was deeded full fee simple ownership in the 55 acres of real property (adjoining the 100 Acre Parcel) located at 1494 Old Hillsboro Road, Franklin, Tennessee (the "55 Acre Parcel") by deed dated October 11, 2001.

[E].  The purchase of the 55 Acre Parcel by Don Cartee was financed through a loan made by Citizens Bank and Savings Company, whose office is located in Russellville, Alabama.

[E].  Rebecca Cartee was made a co-owner of the 55 Acre Parcel by Instrument of Correction dated November 13, 2003.

[F].  Don Cartee has operated a horse boarding and training business on the

two aforementioned properties.

[G].    Rebecca Cartee appointed Alan Cartee as her attorney-in-fact by power of attorney dated May 14, 2003.

In addition to the Stipulations, the court relies upon the Amended Disclosure Statement approved by this Court on September 17, 2007 to give a general overview of the history of this case:

        The Debtor is the 50% owner of two parcels of real property in Williamson County, Tennessee. The other 50% owner of each parcel is the Debtor's mother, Rebecca Cartee. Parcel One has an address of 1494 Old Hillsboro Road, Franklin, Tennessee, and consists of approximately 55.61 acres. Parcel Two has an address of 1528 Old Hillsboro Road, Franklin, Tennessee, containing approximately 100 acres (the two parcels are sometimes referred to herein collectively as the "Real Property.") The Debtor and his non-filing spouse reside upon Parcel Two. The Debtor provides horse riding lessons for hire and horse boarding on the Real Property. The Debtor also conducts some horse sales. These are the only sources of income of the Debtor.

        The Debtor and his mother have substantial disagreements concerning what should be done with this Real Property and the proceeds therefrom. On July 31, 2006, the Debtor filed a complaint in the Chancery Court of Williamson County, Tennessee seeking to declare the rights of his mother and himself in the Real Property and that his mother be required to account for certain funds related to the Real Property. The Debtor's mother has answered and counterclaimed against the Debtor claiming certain amounts due to her. At the instance of the Debtor, this lawsuit was removed to Bankruptcy Court and is pending in this Court as Adversary Proceeding No. 07-0085A (hereinafter the "Adversary Proceeding"). One of the requests of the Debtor in the Adversary Proceeding is that the Real Property be appropriately divided between his mother and himself, or sold and the proceeds therefrom divided between the two owners.

        The monthly operating reports filed by the Debtor for the four months of March, April, May and June 2007 indicate an average monthly income of $16,100 and average monthly expenses of $14,062 resulting in an average net profit for those four months of $2,038 per month. This is in stark contrast to the Debtor's projections at the time of the filing of this case that he expected to average a net of $10,570 per month after ordinary and necessary expenses. Further, the monthly net profit of the Debtor post petition does not reflect servicing of any of the mortgage debt upon the Real Property. The indebtedness secured by the Real Property exceeds $2,500,000.

        The monthly monetary obligation of the Debtor pre-petition on the three mortgages upon the Real Property totaled $22,163 per month.

First Amended Disclosure Statement, Case Number 07-01529, Docket Number 100

(Sept. 17, 2007).[1] After the Disclosure Statement was approved, the court confirmed a plan of reorganization, as proposed by Citizens Bank. The plan contemplated a sale of the real property and a division of proceeds as follows:

> Funds for Implementation of this Plan will come from the sale of the Real Property to JRB, LLC for the purchase price of $9,080,500.00. . . . After payment of all Allowed Claims secured by the Real Property, buyer's agent fee of one (1%) percent, closing expenses and costs, and adjustments for prorations, the remaining Allowed Claims shall be paid at closing pursuant to Article III of the Plan. An amount equal to the aggregate disbursed to the remaining Allowed Claims (i.e., those claims not secured by the Real Property) shall be disbursed at closing to Rebecca Cartee. The remaining sale proceeds shall be held in escrow by Robert L. Scruggs as escrow agent and shall be distributed from escrow as provided in the attached Escrow Agreement upon the resolution of (1) the monetary claims asserted in the Adversary Proceeding and (2) any timely filed Claim objection, provided, however, that any amount distributed upon resolution of the Adversary Proceeding shall be reduced, pro-rata between the parties to the Adversary Proceeding, by an amount as may be determined by the Court or by agreement of the parties sufficient to provide for the payment of the full amount of any Claim to which there has been an unresolved objection, plus a sufficient additional amount, as may be determined by the Court or by agreement of the parties, to allow for any additional interest or other amounts which constitute a portion of any such Claim allowed. Any sale proceeds remaining in escrow after the resolution of the Adversary Proceeding and all Claim objections and payment of all Allowed Claims shall be distributed to the parties in the Adversary Proceeding, pro-rata between those parties. Further, the escrow agent shall pay the Allowed Claim resulting from any Order resolving a Claim objection notwithstanding the lack of resolution of the Adversary Proceeding. At or before the closing of the Sale Agreement, the Debtor and Rebecca Cartee shall execute the Escrow Agreement attached hereto as Exhibit A.

> (B) In the event that the closing of the Sale Agreement does not occur on or before December 31, 2007, to the extent that the stays of 11 U.S.C. §362 have not been lifted by previous Order of this Court or by the operation of 11 U.S.C. §362(e)(1), the Order confirming this Plan shall constitute an Order granting Citizens Bank and Savings Company, Grassland Financial Services, Tennessee Funding, and Green Bank relief from any and all applicable stays of 11 U.S.C. §362.

First Amended Plan of Reorganization Proposed by Citizens Bank and Savings Company Dated October 30, 2007, Docket Number 131 (Oct. 30, 2007).

---

[1]The court takes judicial notice of the entire bankruptcy case file. **See Rule 201 of the Federal Rules of Evidence**; **In re Hamby**, 360 B.R. 657, 659 (Bankr. E.D. Tenn. 2007 (taking judicial notice of undisputed facts of record in the Debtor's bankruptcy case file).

The confirmed plan called for the sale of the real property to close by December 31, 2007. The sale did not close, and Citizens Bank and Grassland automatically gained relief from the automatic stay as of December 31, 2007. As such, all collateral securing the loans to Grassland and Citizens are no longer property of the estate and free to be foreclosed upon by the banks.

Meanwhile, the debtor and his brother and his mother pursued the current adversary proceeding. They ask the court to determine the interests of the respective parties in the real property and to determine interests in other property including farm furniture, vehicles, horses, the horse boarding and training business, and personal property. The specific issues as set forth in the Amended Pretrial Order combined all issues relating to division of property and claims litigation into one evidentiary hearing. The issues as set forth in the pretrial order are as follows:

1. Whether the Debtor and Rebecca Cartee have an ownership interest in the property located at 1494 and 1528 Old Hillsboro Road, Franklin, Tennessee?

2. Whether Rebecca Cartee has an ownership interest in the business operated by Debtor on the subject properties?

3. Whether Rebecca Cartee is entitled to damages arising out of the alleged fraudulent conduct of the Debtor, and if so, in what amount?

4. Any objections to claims of Alan, Rebecca or Diana Cartee shall be heard in conjunction with the hearing of this adversary proceeding.

5. What is the proper allocation of the debt of Debtor and Rebecca Cartee on the obligations owed to Grassland Financial Services and Citizens Bank and Savings Company and other creditors of Debtor, taking into account the payments made by the respective parties toward those debts and any part of said debts used by Debtor or Rebecca Cartee for personal purposes?

6. What amount, if any, is owed by Alan Cartee to Debtor and/or Rebecca Cartee for loans made to or for the benefit of Alan Cartee and secured by property of the Debtor's estate, taking into account payments made by Alan Cartee on said loans, as well as transfers of funds among Debtor, Rebecca Cartee, and Alan Cartee, and how should said amount be allocated to either or both of Debtor and Rebecca Cartee?

7.  What ownership interest, if any, does Rebecca Cartee have in any of the personal property listed on Debtor's statements and schedules or otherwise alleged to be owned by Debtor?

8.  What is the proper accounting for insurance proceeds received by Debtor and Rebecca Cartee on claims made on damage to property of Debtor's estate?

9.  What is the proper resolution of such other matters as are alleged in the Debtor's Complaint and the Counter-complaint of Rebecca Cartee?

## DISCUSSION

### 1. Whether the Debtor and Rebecca Cartee have an ownership interest in the property located at 1494 and 1528 Old Hillsboro Road, Franklin, Tennessee?

#### A. The 100 Acre Tract (1528 Old Hillsboro Road)

Don and Rebecca stipulated in the pretrial order and in the Stipulations for purposes of trial that they were co-owners of the 100 acre tract. Based on that Stipulation the court finds that this issue is no longer in dispute.

#### B. The 55 Acre Tract (1494 Old Hillsboro Road)

The undisputed testimony and proof as to ownership of the 55 acre tract is as summarized in the debtor's post-trial brief is as follows:

> There is no dispute among the parties that this parcel was deeded to Don on October 11, 2001. While Don does not recall that Rebecca's name was on the loan documents executed with Citizens Bank, which financed the purchase of this property, there is no dispute that her name does appear on those loan documents. There is no dispute among the parties (i) that Rebecca filed suit against Don to have her name added to the deed to this parcel, (ii) that Don settled this suit by the execution of an Instrument of Correction on November 13, 2003, which Instrument of Correction arguably corrected the original deed to include Rebecca as a co-owner of the 55 Acre Parcel.

The undisputed proof, as demonstrated by all evidence submitted and the testimony of all witnesses proves far beyond any preponderance of the evidence standard that Don and Rebecca are co-owners of the 55 acre tract.

Don contends, however, that the Instrument of Correction notwithstanding, the

only reason he agreed to allow his mother's name to be added to the deed was in exchange for a promise from Alan and Rebecca to stop harassing him and his wife, and on the condition that Alan and Rebecca make the Citizens Bank mortgage payments.[2] This alleged agreement is not, however, part of any court record in the settlement of the lawsuit. Nor is the agreement consistent with the testimony of Alan and Rebecca who testified that they sought to add Rebecca to the Deed because she was always supposed to have been on it, and because Rebecca wanted to protect the land from Marie's reach.

Don asks the court to find that Rebecca is holding her interest in the 55 acres in constructive trust for his benefit as a result of the duress of Alan and Rebecca. Rebecca argues, however, that the deed listing her and Don as co-owners speaks for itself, and Don voluntarily executed all necessary documents to recognize Rebecca's ½ interest in the 55 acre tract.

The court finds that Don failed to show by a preponderance of the evidence that any sort of constructive trust should be imposed for his benefit. In fact, Don's own testimony was not that he was forced to add Rebecca to the deed, but instead that he agreed to add Rebecca to the deed in order to "keep the peace" in the family. While his actions may have been reluctant, he offered no proof that his voluntary conveyance of the ½ interest in the 55 acre tract to his mother was forced upon him.

The court finds, therefore, that Don and Rebecca are co-owners in the 55 acre tract just as all the documentary evidence in this case indicates.

---

[2]According to all of the witnesses, the Cartee family was formerly very close. Don contends that when he married Marie in 2003, his mother and Alan began harassing him and Marie. Rebecca testified in no uncertain terms of her intense distrust and dislike of Don's wife. In Rebecca's opinion, it was Don's marriage to Marie that broke apart the Cartee family.

## C. Request for Partition of the Real Property

If the court found that Don and Rebecca were co-owners of both tracts, Don seeks partition. The court finds that it cannot and will not grant such a request at this point in the debtor's chapter 11 case.

Confirmation revests the property of the estate in the debtor, (as well as discharging the debtor from all dischargeable pre-petition debts), and the stay of an act against the property of the estate would no longer be applicable. *See In re Turning Point Lounge, Ltd.*, 111 B.R. 44, 46 (Bankr. S.D.N.Y. 1990) (automatic stay ceases to operate upon confirmation of Chapter 11 plan); *In re Korgan*, 52 B.R. 557 (Bankr. D.Or. 1985) (automatic stay expired upon confirmation of Chapter 11 plan); *In Re Paradise Valley Country Club*, 31 B.R. 613, 615 (D. Colo. 1983) ("Since confirmation of a Chapter 11 plan has the dual effect of revesting the debtor with title to its property and discharging the debtor from all dischargeable pre-petition debts, there can be no further application of the automatic stay subsequent to confirmation"); *In re Thrush*, 31 B.R. 106, 107 (Bankr. M.D.Pa. 1983) (order granting relief from automatic stay lacked significance because six days later debtors were discharged and automatic stay was thereby lifted by operation of law). *McKinney v. Waterman S.S. Corp.*, 925 F.2d 1, 4 (1st Cir. 1991). In this case, the confirmed plan provided an extension of the automatic stay until December 31, 2007 to allow for the closing of the proposed sale. Under either scenario, however, as the case is presently postured, the real property revested in the debtor as of confirmation and the automatic stay is terminated either at confirmation or at the latest, December 31, 2007.

The debtor contends that this court's retention of jurisdiction over the adversary proceeding somehow rescues the property for this court to decide what to do with the co-owned property. Such is not the case. The property is gone from the estate; the

banks have relief from the stay, and the disposition of the property, jointly owned by this debtor and his mother is not this court's province. Accordingly, the court denies any remaining request by the debtor to partition the 100 acre and 55 acre tracts.

**2. Whether Rebecca Cartee has an ownership interest in the business operated by Debtor on the subject properties?**

The "horse business," is sometimes referred to by the parties as "Cartee Farms.[3]"

The debtor testified exhaustively about his involvement in the horse business and how why he believes the horse business is a sole proprietorship. The debtor testified that:

(1) from the early 1970's until the present, he was the only family member (with the exception of Alan's wife) that had any interest in horses;

(2) that, since that time to this day, he has been involved in the ownership and breeding of horses;

(3) that after relocating from Alabama to Nashville in 1976 he eventually brought his horses to Nashville;

(4) that he got involved in the training of horses in the early 1970's and continued to learn training techniques and to train horses and riders thereafter, resulting in success in horse shows and an increasing value of the horses he owned for sale or stud purposes;

(5) that he moved his horses on to the 100 Acre Parcel in 1988, and became involved full-time in the ownership and breeding of horses, the boarding of horses in a barn he built on that property, and the training of others to ride the horses;

(6) that he continued using the 100 Acre Parcel for that purpose until he purchased the 55 Acre Parcel, at which time he moved the Horse Business primarily to that property, utilizing the barn and other facilities on that property;

(7) that since his marriage to Marie, she has helped him operate the Horse Business

(8) that Rebecca was not involved in the Horse Business except to mainly to write out checks for his signature for the payment of bills;

(9) that he was the sole signatory on all bank accounts and other accounts ;

(10) that Rebecca never asked for any accounting information from the Horse

---

[3]The court refers to the horse business only as the "horse business." The term "Cartee Farms" refers to all other business conducted on the farm including, but not limited to, the selling of hay and renting of the various facilities on the property and the horse business.

Business, which would consist of only a checkbook and bank statements, until after he married Marie;

(11) that Rebecca was never involved in any horse purchase or sale transactions, any training sessions, any contests participated in by students, any horse breeding, any maintenance activities on the barn or related facilities, any purchases of equipment for use in the Horse Business, any hiring or management of employees, or any other aspect of owning and operating this business;

(12) that he never entered into any kind of agreement, verbal or otherwise, that Rebecca or anyone else had an ownership interest in the Horse Business; and

(13) that his tax returns alone reflect the business expenses of the horse business.

In addition to this testimony, the debtor called no less than ten witnesses to verify that the only people they ever dealt with in the operation of the horse business was Don or Marie.

Rebecca testified that it was understood that all operations on the farm, including the horse business, were family business. She explained that she helped in the operation of the business by answering phone calls about boarding, by cooking meals and washing clothes for employees, and by handling the bank accounts for the business. In her opinion, not only was the realty co-owned with Don, but so were all businesses related to Cartee Farms. Rebecca's position is that while Don ran the horse business, they were partners in this business by virtue of the family operation of all Cartee Farms businesses.

Pursuant to 11 U.S.C. § 541(a), upon the filing of the bankruptcy petition, the bankruptcy estate accedes to any and all property rights the debtor held at the time of filing. The mere filing of bankruptcy does not expand these rights beyond what existed under nonbankruptcy law at filing. To determine the extent of the debtor's interest, this court must look to property rights as defined under state law. 11 U.S.C. § 541(a)(1).

Under Tennessee state law, the court must determine whether the horse business

is a sole proprietorship or a partnership between Rebecca and Don. A sole proprietorship is "[a] form of business in which one person owns all assets of a business in contrast to a partnership and corporation. The sole proprietor is solely liable for all the debts of the business." **State v. Pendergrass,** 13 S.W. 3d 389 (Tenn. Crim. App. 1999), **quoting Hitt v. Hitt**, No. 02A01-9310-CV-00218, 1994 WL 618608 (Tenn. Ct.App., Western Section, Nov. 9, 1994) (citing Black's Law Dictionary).

The Tennessee Court of Appeals in **In re Estate of Jones,** 183 S.W.3d 372, (Tenn.Ct.App. 2005) explains when a partnership exists between entities:

> The Revised Uniform Partnership Act provides that "the association of two (2) or more persons to carry on as co-owners of a business for profit forms a partnership, <u>whether or not the persons intended to form a partnership.</u>" **Tenn.Code Ann. § 61-1-202(a) (2002)**. Subject to several exceptions stated in the applicable statute, the receipt of a share of the profits of the business constitutes prima facie evidence that a partnership exists. **Tenn.Code Ann. § 61-1-202(c)(3).** It therefore follows that a partnership exists "[i]f the parties' business brings them within the scope of a joint business undertaking for mutual profit-that is to say if they place their money, assets, labor, or skill in commerce with the understanding that profits will be shared between them." **Bass v. Bass**, 814 S.W.2d 38, 41 (Tenn.1991) (citing **Pritchett v. Thomas Plater & Co.**, 144 Tenn. 406, 232 S.W. 961, 969-70 (1921)). In the absence of a written partnership agreement, it is incumbent upon the party alleging its existence to prove the fact of partnership by clear and convincing evidence. **Tidwell v. Walden**, 205 Tenn. 705, 330 S.W.2d 317, 319 (1959); **B & S Enterprises v. Rowland**, No. E2003-00458-COA-R3-CV, 2004 WL 115162, at *1 (Tenn. Ct.App. E.S., filed January 26, 2004).

**Id.** at 381-382 (emphasis added).

The Tennessee Court of Appeals in **Pettes v. Yukon**, 912 S.W.2d 709 (Tenn.Ct.App. 1995) explained common factors considered in determining the existence of a partnership:

> In determining whether the parties in this case are partners, no one fact or circumstances is a conclusive test, but each case must be decided upon a

consideration of the totality of all relevant facts. **Roberts v. Lebanon Appliance Service**, 779 S.W.2d 793, 795 (Tenn.1989). In **Bass v. Bass**, 814 S.W.2d 38 (Tenn.1991), the Supreme Court considered the sole issue of whether there was an implied partnership. The Court said:

> [T]he existence of a partnership depends upon the intention of the parties, and the controlling intention in this regard is that ascertainable from the acts of the parties. **Wyatt v. Brown**, 39 Tenn.App. 28, 281 S.W.2d 64, 67 (1955). Although a contract of partnership, either express or implied, is essential to the creation of partnership status, it is not essential that the parties actually intend to become partners. **Wyatt**, 281 S.W.2d at 67. The existence of a partnership is not a question of the parties' undisclosed intention or even the terminology they use to describe their relationship, nor is it necessary that the parties have an understanding of the legal effect of their acts. **Roberts,** 779 S.W.2d at 795-96. It is the intent to do the things which constitute a partnership that determines whether individuals are partners, regardless if it is their purpose to create or avoid the relationship. **Wyatt**, 281 S.W.2d at 67. Stated another way, the existence of a partnership may be implied from the circumstances where it appears that the individuals involved have entered into a business relationship for profit, combining their property, labor, skill, experience, or money.

814 S.W.2d at 41. The burden of proof on the existence of a partnership is upon the one who alleges the partnership. **Mullins v. Evans**, 43 Tenn.App. 330, 308 S.W.2d 494, 498 (Tenn.App.1957).

**Pettes**, 924 S.W.2d at 715. The key to a determination of whether or not a partnership exists is its "legal effect." The Supreme Court has stated that

> [t]he intent of parties to form a partnership may be implied; it need not be expressed in writing or orally, if it can be derived from the parties' actions. [I]t may be asserted objectively from all the evidence and circumstances. It is not essential that the parties know that their contract, in law, creates a partnership. The legal effect of the parties' agreement, not their subjective intent, determines whether there is a partnership.

**Bass,** 814 S.W.2d at 41 n. 3 (**quoting** 59A AM.JUR.2D PARTNERSHIP, § 152 (1987)).

The application to the law in this case is not an easy task. Besides the extremely disjointed nature of the proof, the family acrimony makes the court's decision even more difficult. The ultimate burden of proof to show the existence of a partnership falls on

Rebecca Cartee as the party asserting the existence of a partnership. The court finds that she carried that burden.

All the proof in this case indicates that every member of the Cartee family treated Cartee Farms, from its earliest days, as their own personal piggy bank. This is not a judgment as to the family dealings of the Cartee's, but a factual finding as to the way the Cartee's operated the family farm. Cartee Farms, however, was more than just the operation of the horse business. By way of testimony from Rebecca, Alan and Don money was generated to and from Cartee Farms by, among other things, rental of dwelling units, barns and other space, by operation of a hay business, and by financing and refinancing the equity in the farm.

As a result of the "sharing" of Cartee Farms, each member of the family had some sort of "career" that the operation of the family farm helped them to achieve. Alan Cartee was successful in the music business and he owes some of that success to the generosity of his family. Likewise, Don Cartee owes the success of the horse business, which just happened to be operated on the farm, to the piggy bank that was Cartee Farms.

In this case, the major assets of the horse business were owned jointly by Don and Rebecca. Those assets include but are not limited to:

| | |
|---|---|
| (1) The Real Property: | Jointly owned by Rebecca and Don. |
| (2) The Horses: | Some were owned by Don; some held by Don as property of another; Alan's wife, Diana Day Cartee's also had horses. |
| (3) The Tack: | No meaningful proof was presented as to who owns the tack. Don, Alan and Rebecca (via the "family business theory) all claim ownership in some or all of the tack. The burden of proof as to what is property of the estate generally rests with the creditor. *In re* |

*__Altchek__*, 124 B.R. 944, 955-56 (Bankr. S.D.N.Y.1991), but in this instance, Don did not list tack as an asset of the estate. Except for the tack specifically identified by Alan as owned by his wife Diana Day Cartee, the court finds that the tack is a jointly owned asset of Rebecca and Don in their partnership of running the horse business.

(4) Necessary Tools to Operate the Horse Business:

Included in this category of assets are the jumps, the riding ring, the barn, other improvements to the real property, office furniture and other miscellaneous items necessary to run the horse business. Based on the testimony of Alan, Rebecca and Don, these assets are held in various manners. For example, the office furniture in the barn is claimed by Alan Cartee (as marital property belonging to him and his wife); the improvement to the real property are held jointly by Don and Rebecca; the jumps and other equipment, again not listed as an asset of the estate in the debtor's Statements and Schedules, are found by the court to be jointly owned by Don and Rebecca. In essence, most of the items in this category are jointly owned.

(5) Farm Equipment:

In this category are all mechanized equipment and vehicles used in operation of the farm and horse business. The particulars of ownership of each of these items is discussed elsewhere in this Decision. However, for purpose of determining whether Rebecca Cartee had any interest in the horse business, it is enough to note that while much of the equipment is titled to Don Cartee, the Cartee Farms "piggy bank" made many of these purchases possible. Even if Don owns the majority of the equipment, he allowed that equipment to be used to further the partnership business.

Weighing all the factors, the court must find that the running of the "horse business" more closely resembles a partnership between Rebecca and Don on their jointly owned property than a sole proprietorship. Don's testimony and that of his supporting witnesses about his responsibility for the operation of the horse business was credible. However, the business was just one of the many ventures that contributed income into the Cartee "piggy bank."

The Cartee's operation of the farm as an income generator stems from the horse

business, the hay business, rental of property, and other ventures by each of the family members. The court does not doubt the sincerity of the debtor's testimony concerning how much of his time and effort have gone into working in the horse business, and his hard work churned the Cartee Farms coffers, but the court is unconvinced that the horse business was a sole proprietorship. In the words of the Tennessee Supreme Court, this is a case where "it appears that the individuals involved have entered into a business relationship for profit, combining their property, labor, skill, experience, or money." **Bass**, 814 S.W.2d at 41.

Accordingly, the court finds that the horse business is a partnership between Don and Rebecca Cartee.

**3. _Whether Rebecca Cartee is entitled to damages arising out of the alleged fraudulent conduct of the Debtor, and if so, in what amount?_**

Rebecca Cartee alleges the "fraudulent conduct" of the debtor entitles her to damages of an unspecified amount. The elements of fraud are: (1) an intentional misrepresentation of a material fact, (2) knowledge of the representation's falsity, (3) an injury caused by reasonable reliance on the representation, and (4) the requirement that the misrepresentation involve a past or existing fact. **Kincaid v. SouthTrust Bank** 221 S.W.3d 32, 40 (Tenn.Ct.App. 2006); **Dobbs v. Guenther**, 846 S.W.2d 270, 274 (Tenn.Ct.App. 1992). In her pleadings, Rebecca alleges that the debtor has failed to pay various financial obligation, diverted funds generated from family owned-businesses, misapplied or misappropriated revenues of Cartee Farms, borrowed money against the farm without her knowledge or consent, that he misappropriated insurance proceeds, allowed the farm to fall into disrepair, and has sold or diverted other farm assets without Rebecca's consent.

Despite these numerous allegations, the record is almost wholly devoid of proof. Rebecca testified extensively about her distrust for Don's wife. She also stated that she was denied access to the books relating to operation of the horse boarding and training business. She did not, however, carry her burden of proof to demonstrate that the debtor intentionally misrepresented material facts with knowledge of the falsity causing injury to Rebecca involving a past or existing fact. While any court would likely find a business run like a piggy bank constitutes fraud, this was no corporate business. Instead, this was a family farm. The court cannot attribute fraud to one member of family and not another when all were complicit in the arrangement. Rebecca failed to establish the necessary elements of fraud under the law, and therefore failed to carry her burden of proof. As such, her request for damages against the debtor is heretofore DENIED.

> **4.** **_Any objections to claims of Alan, Rebecca or Diana Cartee shall be heard in conjunction with the hearing of this adversary proceeding._**[4]

Pursuant to § 502(a) of the Bankruptcy Code and Bankruptcy Rule 3001(f), a properly executed proof of claim constitutes prima facie evidence of its correctness. It is a well-settled principle of bankruptcy law that a party objecting to the claim must meet the burden of going forward to overcome or at least equalize, the presumption forced by 502(a). The "burden of ultimate persuasion," however, "is always on the claimant." **_In re Kemmer_**, 315 B.R. 706 (Bankr. E.D. Tenn. 2004). The underlying rationale for this rule is that a claimant in a bankruptcy proceeding is in the same posture as a civil plaintiff in a non-bankruptcy proceeding, who generally is assigned the burden of proving its claim against the defendant under non-bankruptcy law. **_See In re Lewis_**, 80 B.R. 39,

---

[4]The claim of Diana Day Cartee was resolved prior to this adversary proceeding. Debtor's counsel submitted the verified statement of Diana Cartee's attorney concerning certain agreements allegedly reached between Diana Day Cartee and Don Cartee. The court cannot consider any new post-trial exhibits as evidence. The proof was closed at the conclusion of the trial, and submission of exhibits post-trial without allowing opposing counsel to object or challenge the submitted documents would unduly prejudice the defendants.

40 (Bankr. E.D.Pa. 1987); *In re KDI Corp.*, 2 B.R. 503, 504 (Bankr. S.D.Ohio 1980). A proof of claim that has been filed will be deemed allowed unless an objection is filed. 11 U.S.C. § 502. *In re Kemmer*, 315 B.R. 706 (Bankr. E.D. Tenn. 2004).

### A. Monetary Claim of Rebecca Cartee

Rebecca Cartee originally filed a $3,500,000.00 unsecured non-priority claim in Don's bankruptcy case. On October 27, 2007, she amended her proof of claim increasing the unsecured, non-priority amount to $7,000,000.00. No documentation or other supporting evidence accompanied her original proof of claim, nor the amendments thereto. The debtor objected to Rebecca's claim. The issue of the allowance of Rebecca's monetary claim, was rolled into this adversary proceeding by agreement of the parties in the pretrial order.

Rebecca's proof of claim is statutorily entitled to a prima facie presumption of correctness pursuant to § 502(a) of the Bankruptcy Code and Bankruptcy Rule 3001(f). It was then incumbent upon the debtor to come forward to meet or equal that presumption by his own proof. At trial, the debtor's own testimony as well as that of his financial expert, James N. Wilson, certainly provided ample proof to rebut the statutory presumption. At that point, the ultimate burden of persuasion fell upon Rebecca to prove the efficacy of her $7,000,000.00 claim against the debtor.

Most all of Rebecca's testimony concerned her dislike for the debtor's wife and the division of real and personal property. Although she was questioned about the family finances, her testimony was largely confined to her opinions about who had made payments on the mortgages, farm equipment, and personal property. She also testified that she believed that the debtor's wife was precluding her from the books and records of the farm operations, and that the bankruptcy was filed only because of the debtor and

his wife's mismanagement of the farm.

At no point, however, did Rebecca affirmatively set forth evidence or testimony in support of a $7,000,000.00 claim. Based on Rebecca's failure to meet her ultimate burden of persuasion, the court therefore DENIES the claim of Rebecca Cartee in the amount of $7,000,000.00, and finds that she failed to prove the debtor owes her money in any amount.

### B. Monetary Claim of Alan Cartee

Alan Cartee filed a Proof of Claim on October 15, 2007 asserting an unsecured, non-priority claim in the amount of $3,500,000.00. During the trial on these matters, Alan Cartee withdrew any monetary claim he had against the debtor. The court therefore, finds this matter moot.[5]

**5.** **What is the proper allocation of the debt of Debtor and Rebecca Cartee on the obligations owed to Grassland Financial Services and Citizens Bank and Savings Company and other creditors of Debtor, taking into account the payments made by the respective parties toward those debts and any part of said debts used by Debtor or Rebecca Cartee for personal purposes?**

It is undisputed that both Rebecca and Don Cartee are co-makers of the notes on the mortgages on both the 55 acre and 100 acre tracts. According to Don, the obligations have not been paid equally on all of the family farm obligations, and he seeks contribution for amounts he has paid in excess of amounts Rebecca has paid. The debtor's bankruptcy petition lists the following outstanding obligations:

| Creditor | Loan & Collateral | Owed @ Petition | Maker(s) |
| --- | --- | --- | --- |

---

[5]Even if Alan Cartee had not withdrawn his monetary claim, he, like his mother, failed to carry his ultimate burden of persuasion to establish any claim against the debtor.

| | | | |
|---|---|---|---|
| Citizens Bank | First Mortgage (opened 10/01/01) 1494 Old Hillsboro Road | $1,258,787.00 | Don and Rebecca Cartee |
| Cumberland Bank | 1999 C-230 Mercedes Benz 1993 Ford Truck Flatbed, Titan Flatbed Trailer, Sidekick Trailer | $10,000.00 | Don Cartee |
| Grassland | Second Mortgage (2006) 1528 Old Hillsboro Road | $320,000.00 | Don and Rebecca Cartee |
| Grassland | Mortgage (2005) 1528 Old Hillsboro Road | $855,000.00 | Don and Rebecca Cartee |

At trial, the debtor relied upon the testimony of an expert forensic accountant, James C. Wilson, Jr.[6] Mr. Wilson testified that he accounted for all transactions that he received for which he was able to obtain verification, primarily through bank statements of the various parties. He stated that he was able to verify the source of each and every payment made on the loans by Grassland and Citizens Bank. The Accounting shows the exact amounts paid by Don, Rebecca, and Alan on these loans. The payments for Don include payments made by Marie and the payments for Alan include payments made by Diana. An accounting strictly among the secured financial obligations to Grassland and Citizens, as testified to by Mr. Wilson, reveals the following:

### *Grassland Financial*
Payments by Don Cartee      $146,309.04
Payments by Alan Cartee      $6,408.18

---

[6]The debtor relied upon the expert opinion of James Wilson at trial to support Don's allegations concerning allocation of the debt. Mr. Wilson testified at trial that he used all financial records possibly available to him to reconstruct the past and present finances of Rebecca, Alan, and Don Cartee. Mr. Wilson took all checks that the parties were able to provide that had cleared the bank accounts of the Cartee's, the loan instruments, and tax returns to put together into a single database. In essence, he created a consolidated bank account based on the information provided to him. This "consolidated bank statement" is fitting in light of the Cartee's financial practices, but did not rest on any underlying assumptions of family running a business together.

Payments by Rebecca Cartee    $9,086.20
          **TOTAL:**           **$161,803.42**

**Citizens Bank**
Payments by Don Cartee        $256,155.46
Payments by Alan Cartee       $17,628.02
Payments by Rebecca Cartee    $228,604.71
          **TOTAL**           **$511,240.67**

In addition to the mortgages, Don claims that Rebecca also owes in contribution for amounts for equipment purchases, for $185,000 borrowed by Rebecca but paid off by the Grassland loan, and for insurance checks that were deposited into Rebecca's accounts. Based on Mr. Wilson's numbers, the court concludes that on an allocation of debt basis, Rebecca would owe to Don $140,737.39 if Don can show entitlement to contribution.

| Liability for ½ of Mortgages: | Rebecca | Don |
|---|---|---|
| | $1,459,391.02 | $1,459,391.02 |
| Adjustments | | |
| Excess Payments on Grassland Loan | $130,814.66 | |
| Excess Payments on Citizens Loan | $9,922.73 | |
| Rebecca's Liability for $185,000 Loan paid off by Grassland Loan | $0 | |
| Contribution for Insurance Proceeds | $0 | |
| Reimbursement for Equipment | $0 | |
| NET DUE FROM REBECCA TO DON: $140,737.39[7] | | |

---

[7] In calculating these figures, the court relied upon the Wilson reports as urged by the debtor. However, the court disagreed with Mr. Wilson in reaching a conclusion of how much Rebecca might owe to Don.

Excess Payments of Grassland Loans = Don's payments - (Rebecca + Alan payments). The court does NOT include any money transfers between Don, Alan, or Rebecca.

Excess Payments on the Citizens Loan = Don's payments - (Rebecca + Alan's payments). Does NOT include any money transfers between Don, Alan, or Rebecca.

Rebecca's Liability for $185,00.00 Personal Loan— The court finds that Rebecca has no additional liability for this loan that was voluntarily rolled into the Grassland loan on

Generally, contribution accrues upon the payment of a principal obligation, and a prima facie case is made out for contribution when it is shown that "one of two joint debtors has paid more than a moiety of the common debt and, further, it is a general rule of apportionment in contribution that, in the absence of proof to the contrary, all co-obligors must contribute equally in discharging their common obligations. *Winebarger v. Winebarger* 653 S.W.2d 746, 748 -749 (Tenn.Ct.App.,1983); *U.S. Cas. Co. v. Standard Acc. Ins. Co.*, 136 S.W.2d 504 (1940); *Elkins Const. Co. v. Naill Bros.*, 76 S.W.2d 326 (1934); *Brooks v. Honeycutt*, 408 S.W.2d 404 (1966).

"The primary requisites of the equitable right to contribution and the obligation to contribute, and of the corresponding right and obligation at law, are (1) a situation wherein the parties are in *aequali juri* under some common obligation or burden, and (2) compulsory payment or other discharge, by the party seeking contribution, of more than his fair share of the common obligation or burden." *Winebarger* at 749 (quoting 18 AM.JUR.2D, Contribution, Sec. 7, p. 16).

---

refinancing on which both parties were co-makers. The court finds any claim that Rebecca alone benefitted from this loan disingenuous given the Cartee piggy bank modus operandi.

Rebecca's Contribution for Insurance Proceeds — The court finds that no additional money is owed to Don based on the deposit of any insurance proceeds into Rebecca's account. All parties to the check endorsed the check and all willingly allowed funds to be deposited into Rebecca's account. Those insurance proceeds were deposited, in part, in Rebecca's account, but the court finds that the testimony of all witnesses, including Don, indicates that regardless of where the money was deposited, it was available for overall Cartee Farms use.

Reimbursement for Farm Equipment— The court finds that Don Cartee owns all farm equipment and vehicles for which he currently holds a title. The specific division of farm equipment, vehicles and other personal property is discussed *infra*. Regardless of the ultimate ownership of each piece of equipment, the court finds that Cartee Farms as a whole financed, funded, or otherwise provided the necessary funds for most, if not all the equipment. Accordingly, no amount is owed by Rebecca Cartee to Don Cartee for any equipment payments.

One who has <u>satisfied</u> the joint obligation is entitled to contribution. ***Carter v. E. T. & W. N. C. Transp. Co.,*** 243 S.W.2d 505, 507 (Tenn.Ct. App.1949). As explained by the Williston on Contracts treatise:

> It has been frequently stated that no right to contribution in favor of a joint debtor exists until actual payment of more than the share of the whole debt which that debtor ought to pay. In this regard, it has been said:"The fact that the principal debtor … had made default in paying his debt did not, of itself, cause a loss to either of those who had guaranteed payment of the debt, or give either a right of action against the other for contribution, for the principal debt might still be paid by the principal debtor, or be released, compromised, or abated, as between the principal debtor and principal creditor.

WILLISTON ON CONTRACTS, § 36:14, *Joint Duties and Rights Under Contracts* (Nov. 2007 update). In other words, the debtor's entitlement to contribution is dependent upon his duty to first satisfy the obligation for which he and Rebecca are jointly liable. Contribution is an equitable theory designed to achieve equality of payment where one party has paid for another party's share. Although Mr. Wilson's report, as interpreted by the Court shows that at this point Don has written more checks than Rebecca on the mortgages, the liability has not been satisfied and until it is, no right to contribution does arises.

Furthermore, contribution requires that Don have actually paid more than his equal share of the debt. While the forensic accountant's report shows that Don Cartee wrote more checks for the mortgages than Rebecca, the report does not show where that money originated. The court is convinced from the proof presented at trial that the money came from operation of Cartee Farms as a whole, not just the horse business, and that Don's writing of the checks that paid the mortgage does not, in and of itself, establish he actually paid more than his fair share.

Accordingly, the court holds that it cannot, under the law, find any right to

contribution in favor of any party at this time. Not only is the debt not satisfied, the court finds that Don failed to carry his burden of proof that he has actually paid more than his fair share of the mortgage debt. As such, the allocation of the debt is resolved by finding that Rebecca, while a co-maker on the notes, at this time owes $0 to the debtor.

**6.** ***What amount, if any, is owed by Alan Cartee to Debtor and/or Rebecca Cartee for loans made to or for the benefit of Alan Cartee and secured by property of the Debtor's estate, taking into account payments made by Alan Cartee on said loans, as well as transfers of funds among Debtor, Rebecca Cartee, and Alan Cartee, and how should said amount be allocated to either or both of Debtor and Rebecca Cartee?***

The testimony of Alan and Rebecca, and even to some extent, Don, support the court's finding that this family ran their financial affairs as single unit. Although their relationships deteriorated, they cannot undo their financial dealings simply by having an forensic accounting expert try to parse through who wrote what checks. Mr. Wilson's consolidated checkbook analysis does not tell the tale of this family's dealings.

Don would have this court, on some form of contribution or other equitable theory find that Alan Cartee is indebted to Don and/or Rebecca for money he received from Cartee Farms. The court finds absolutely no proof in the record to support any theory of liability against Alan. Any money that Alan received from Cartee Farms was voluntarily given by Rebecca and Don. Any money that Alan gave to Cartee Farms was also voluntary. Alan is not a signatory on any of the relevant loans, and there is no written proof that he ever promised to repay monies he received from Cartee Farms. Don's testimony that Alan was to repay any money he received was not convincing.

Rebecca wanted no money from Alan and her testimony that there were no agreements for Alan or any other family member to repay any monies taken out of the

farm was convincing. Based on the credible testimony or Rebecca and Alan and the utter paucity of proof to show Alan owes Don or Rebecca any money, the court finds Alan owes Don $0 and Alan owes Rebecca $0.

**7.** ***What ownership interest, if any, does Rebecca Cartee have in any of the personal property listed on Debtor's statements and schedules or otherwise alleged to be owned by Debtor*?**

The debtor listed the following farm equipment and vehicles as owned solely by Don Cartee in his Statements and Schedules, and the court summarizes the testimony as to each piece of property:

| <u>*Personal Property*</u>[8] | <u>*Other Proof*</u> |
|---|---|
| • John Deere 7400 Tractor With Disc | Don testified he owns. Rebecca testified tractors bought with "family money." |
| • John Deere 6400 Tractor with Hay Baler | Don testified he owns. Rebecca testified tractors bought with "family money." |
| • John Deere 5400 Tractor with Front End Loader | Don testified he owns. Rebecca testified tractors bought with "family money." |
| • John Deere 1070 Tractor | Don testified he owns. Rebecca testified tractors bought with "family money." |
| • Massey Ferguson 263 Diesel Tractor | Don testified he owns. Rebecca testified tractors bought with "family money." |
| • Bushhog Squeeler | Don testified he owns. Rebecca testified bought with "family money." |
| • Dixie King Bushhog | Don testified he owns. Rebecca testified bought with "family money." |
| • John Deere 325 Riding Mower | Don testified he owns. Rebecca testified bought with "family money." |

---

[8]Any other property not listed here, but included on Schedule B, the court finds is owned individually by Don.

- 15 24' Hay Wagons

  Don testified he owns. Rebecca testified tractors bought with "family money." Alan testified bought with family money and hay business was a family operation on Cartee Farms.

- 8' Disc Cutter

  Don testified he owns. Rebecca testified bought with "family money."

- M & W Rake

  Don testified he owns. Rebecca testified bought with "family money."

- John Deere Single Rake

  Don testified he owns. Rebecca testified bought with "family money."

- John Deere Bushhog

  Don testified he owns. Rebecca testified bought with "family money."

- John Deere 338 Square Baler

  Don testified he owns. Rebecca testified bought with "family money."

- Manure Spreader

  Don testified he owns. Rebecca and Alan testified, generally, that all farm equipment bought with "family money."

- Titan Flatbed Trailer

  Application for Certificate of Title Signed by "Cartee Farms" as Owner and Listing Cartee Farms– Don Cartee under "Name."

- 1998 Freightliner

  Title shown to Don G. Cartee

- 1998 Sidekick Trailer

  Title shown to Don G. Cartee

- 1999 C230 Mercedes Benz

  Title shown to Don G. Cartee. Alan and Rebecca stated car belongs to Rebecca and Don.

- 1998 Chevy Pickup

  Title shown to Donny G. Cartee

- 1993 Ford Truck Flatbed

  Title shown to Don G. Cartee. Alan testified this was his father's truck, and therefore belonged to his mother.

- Three Horse Featherlight Trailer

  Don testified he owns. Rebecca and Alan testified, generally, that all farm equipment bought with "family money."

- Two Bedroom Sets

  Don testified he owns. Alan and Rebecca testified that Alan purchased later gave to Rebecca.

- Art Work at Offices at

25-U.S. Bankruptcy Court, M.D. Tenn.

| | |
|---|---|
| 1494 Old Hillsboro Rd | Alan testified that this property belongs to he and his wife and was not included in any sale of the real property. |
| • Office Furniture at1494 Old Hillsboro Rd. | Don testified that he owns. Alan testified that this property belongs to he and his wife and was not included in any sale of the real property. |
| • Four Sets of Office Furniture Desk/ Credenza at 1494 Old Hillsboro Road | Don testified that he owns this furniture. Alan testified that this property belongs to he and his wife and was not included in any sale of the real property. |
| • Large Conference Table with Chairs | Alan testified that this belongs to Alan. Don testified this belongs to Don. |
| • Misc Musical Recording Equipment | Don testified that Alan owns some of the music equipment and that some of the other equipment is owned by all three brothers. Don testified that some of the equipment is at the farm and some is used by Alan on Music Row. |

Other personal property at issue that was not listed in the Statements and Schedules is as follows:

| | |
|---|---|
| • 1992 Homemade Trailer | Title shown to Don G. Cartee. |
| • 1969 Ford F350 | Title shown to Don G. Cartee. Alan testified this was left to Rebecca through his mother's will. |
| • Horseshoe Diamond Ring | Don testified that the ring belongs to him and Rebecca and Alan claim it belongs to Alan. |
| • Two Jeep Vehicles: | Don testified he owns. |
| • Cadillac | Don testified he and Rebecca own. |

It has been recognized that the burden of proof as to what is property of the estate generally lies with the creditor. **In re Altman**, 230 B.R. 6, 11 (Bankr. D.Conn. 1999),

*vacated in part on other grounds,* 254 B.R. 509 (D.Conn. 2000), **In re Altchek**, 124 B.R. 944, 955-56 (Bankr. S.D.N.Y. 1991). In this case, much of the court's decision must rest upon witness credibility, and a balancing of the evidence based on the totality of the circumstances of this case. Based on the court's earlier findings about the nature of the Cartee "piggy bank," the court credits the testimony of Rebecca that most all of the possessions of Cartee Farms occurred through a voluntary "pooling" of family assets. The court finds, therefore, that unless a party had convincing proof the contrary, Rebecca Cartee met her burden to show that the following personal property belongs to Don and Rebecca Cartee jointly.

| ***Personal Property*** | ***Findings as to Ownership*** |
|---|---|
| • John Deere 7400 Tractor With Disc | Don and Rebecca Cartee |
| • John Deere 6400 Tractor with Hay Baler | Don and Rebecca Cartee |
| • John Deere 5400 Tractor with Front End Loader | Don and Rebecca Cartee |
| • John Deere 1070 Tractor | Don and Rebecca Cartee |
| • Massey Ferguson 263 Diesel Tractor | Don and Rebecca Cartee |
| • Bushhog Squeeler | Don and Rebecca Cartee |
| • Dixie King Bushhog | Don and Rebecca Cartee |
| • John Deere 325 Riding Mower | Don and Rebecca Cartee. |
| • 15 24' Hay Wagons | Don and Rebecca Cartee |
| • 8' Disc Cutter | Don and Rebecca Cartee |
| • M & W Rake | Don and Rebecca Cartee |
| • John Deere Single Rake | Don and Rebecca Cartee |
| • John Deere Bushhog | Don and Rebecca Cartee |
| • John Deere 338 Square Baler | Don and Rebecca Cartee |
| • Manure Spreader | Don and Rebecca Cartee |

- Titan Flatbed Trailer      Don and Rebecca Cartee

- 1998 Freightliner      Don Cartee. Title shown to Don G. Cartee.

- 1998 Sidekick Trailer      Don Cartee. Title shown to Don G. Cartee.

- 1999 C230 Mercedes Benz      Don Cartee. Title shown to Don G. Cartee.

- 1998 Chevy Pickup      Don Cartee. Title shown to Don G. Cartee.

- 1993 Ford Truck Flatbed      Don Cartee. Title shown to Don G. Cartee.

- Three Horse Featherlight Trailer   Don and Rebecca Cartee.

- Two Bedroom Sets      Rebecca Cartee.

- Art Work at Offices at 1494 Old Hillsboro Rd      Alan Cartee.

- Office Furniture at1494 Old Hillsboro Rd.      Alan Cartee

- Four Sets of Office Furniture Desk/ Credenza at 1494 Old Hillsboro Road      Alan Cartee.

- Large Conference Table with Chairs      Alan Cartee

- Misc Musical Recording Equipment      Second Studio equipment owned by Alan Cartee. First Studio equipment owned jointly by Alan, Brent and Don. Any other music equipment owned by Alan Cartee.

- 1992 Homemade Trailer      Don Cartee. Title shown to Don G. Cartee.

- 1969 Ford F350      Don Cartee. Title shown to Don G. Cartee.

- Horseshoe Diamond Ring      Alan Cartee.

- Two Jeep Vehicles:      Don Cartee.

- Cadillac      Don and Rebecca Cartee.

28-U.S. Bankruptcy Court, M.D. Tenn.

**8.   What is the proper accounting for insurance proceeds received by Debtor and Rebecca Cartee on claims made on damage to property of Debtor's estate?**

As discussed earlier in the allocation of debt portion of the Memorandum, the allocation of insurance proceeds results in Rebecca Cartee owing no additional amounts to Don Cartee.

**9.   What is the proper resolution of such other matters as are alleged in the Debtor's Complaint and the Counter-complaint of Rebecca Cartee?**

Any allegations of Rebecca Cartee's counter-complaint are hereby dismissed for failure to prove any of her allegation by a preponderance of the evidence.

## CONCLUSION

The court finds that (1) Don and Rebecca are co-owners in the 55 acre tract just as all the documentary evidence in this case indicates; (2) the court finds that the horse business is a partnership between Don and Rebecca Cartee; (3) Rebecca failed to establish the necessary elements of fraud under the law, and therefore failed to carry her burden of proof. As such, her request for damages against the debtor is heretofore DENIED; (4) based on Rebecca's failure to meet her ultimate burden of persuasion, and Alan's withdrawal of his monetary claim, the court denies the claims of Rebecca and Alan Cartee; (5) the court finds no right to contribution in favor of any party at this time. The allocation of the debt is resolved by finding that Rebecca, while a co-maker on the notes, at this time owes $0 to the debtor; (6) Alan owes Don $0 and Alan owes Rebecca $0; (7) the division of personal property is as set forth more specifically above herein; (8) the allocation of insurance proceeds results in Rebecca Cartee owing no additional amounts to Don Cartee; and (9) the allegations of Rebecca Cartee's counter-complaint are hereby

dismissed for failure to prove such by a preponderance of the evidence.[9]

The court's exhaustive Memorandum is meant to end this ugly, repetitive pattern of family fighting.[10]   Accordingly, any personal asset that is not specifically addressed, that cannot be divided by agreement of the parties, shall be sold and the net profits, after payment of sale expenses, shall be divided equally among Don and Rebecca Cartee.

An appropriate Order will issue.

***THIS MEMORANDUM WAS SIGNED AND ENTERED ELECTRONICALLY AS INDICATED AT THE TOP OF THE FIRST PAGE.***

---

[9]Debtor's counsel indicated at trial and in post-trial filings that the debtor was seeking to have Alan and Rebecca pay some portion of the bill for hiring Wilson & Wilson, PC.  When Wilson was hired as a professional by the debtor, the debtor's request provided:

[s]ubject to approval of the Court, Debtor has agreed to compensate the Accountant. . .

Any such request for payment from Rebecca and Alan, assuming it was properly before the court, is denied.

[10] "Family love is messy, clinging, and of an annoying and repetitive pattern, like bad wallpaper." FRIEDRICH NIETZSCHE, 1844-1900.

30-U.S. Bankruptcy Court, M.D. Tenn.